C. TONY PICCUTA (AZ SBN: 028444)
SCOTTSDALE INJURY LAWYERS, LLC
8700 E. Pinnacle Peak Road, Suite 204
Scottsdale, Arizona 85255
Telephone: (480) 900-7390
Facsimile: (480) 562-6060
tony@scottsdaleinjurylawyers.com

Attorney for Plaintiff, Michael Rose

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Rose, as personal representative for the estate of Bradley Rose and as personal representative on behalf of all statutory beneficiaries of Bradley Rose, deceased;<br><br>Plaintiff,<br><br>v.<br><br>Matthew Farney, Jose Cardenas, Devin Godfrey and Nasia Shrader, in their individual capacities; Sheriff Doug Schuster, in his individual capacity; and Does 1–10, inclusive,<br><br>Defendants. | No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Michael Rose, alleges as follows:

## **INTRODUCTION**

This action arises from the deadly shooting of Bradley Rose by Deputy Matthew Farney of the Mohave County Sheriff's Office. On April 17, 2021, Bradley suffered a psychotic episode while driving from his sister's home to his girlfriend's residence. Mohave County Deputy Sheriffs, Defendants Cardenas, Farney, Godfrey and Shrader, began to pursue Bradley, who had lost touch with reality and had begun to drive in an

unpredictable manner. The pursuit continued at a low rate of speed until Bradley arrived and parked at the home of his girlfriend. Farney arrived seconds later and parked his vehicle behind Bradley's. He watched as Bradley turned around and stared at him with a blank look in his eyes. It was apparent to Farney that Bradley was unarmed, was not attempting to flee and could not appreciate the circumstances or his surroundings. Further, Farney was unaware of any criminal history of Bradley. Farney was aware, however, that the other three deputies were seconds away and available to assist with the apprehension of Bradley.

Farney decided to take matters into his own hands. He unholstered his firearm, got out of this vehicle and pointed his weapon at Bradley. Farney gave no commands and made no attempt to subdue Bradley with less lethal force. He quickly moved toward Bradley with his gun drawn and went hands on. Farney then disengaged and put space between the two of them. At this time, Godfrey and Shrader were at the scene. However, Farney again failed to enlist the help of the other deputies, failed to use less lethal force and provided Bradley with no commands or instructions. Farney simply raised his gun and fired at Bradley, striking him four times. Bradley then stumbled a few feet toward his girlfriend's residence before collapsing to the ground, covered in his own blood and struggling to breathe.

Godfrey and Shrader were out of their vehicles and watched as Bradley fell to the ground. Instead of running for a first aid kit or immediately applying pressure to Bradley's gunshot wounds to slow the bleeding, Shrader held Bradley at gunpoint while Godfrey applied handcuffs. Godfrey and Shrader did so, knowing that Bradley had just been shot multiple times, that he needed immediate emergency medical care and that he was incapacitated. Instead of allowing Bradley to see his girlfriend, holding his hand or otherwise permitting him to die with dignity, all four deputies knowingly allowed Bradley to remain handcuffed for nearly 17 minutes as he bled to death. Bradley was pronounced dead shortly after 10:00 p.m. The cause of death was multiple gunshot wounds to the chest.

Because of Bradley's wrongful and untimely death, this lawsuit is brought as a survival action by Bradley's father, Michael Rose, as personal representative for the estate of Bradley Rose.  This lawsuit is also brought under Arizona's wrongful death statutes by Michael Rose as personal representative on behalf of himself and Bradley's mother, Julia Rose, as statutory beneficiaries.  The acts and omissions complained of herein deprived Bradley of his Fourth Amendment right to be free from the use of excessive force.  The misconduct also deprived Bradley's parents of the familial relationship with their son, as protected by the First and Fourteenth Amendments to the United States Constitution.  Michael Rose is suing the deputies and Sheriff Schuster in their individual capacities for their constitutional violations.  He also asserts state law claims against Farney and Sheriff Schuster, alleging that Schuster is vicariously liable for the state law torts committed by his deputy, Farney, acting within the scope of his employment.

## **JURISDICTION AND VENUE**

1. This action arises under 42 U.S.C. § 1983, conferring jurisdiction upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court also has jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

2. Venue is proper in the District of Arizona because a substantial part of the events or omissions giving rise to the claims occurred in Mohave County, which is within the judicial district.  28 U.S.C. § 1391(b).

## **PARTIES**

3. Plaintiff, Michael Rose, as personal representative for the estate of Bradley Rose, brings this action pursuant to Ariz. Rev. Stat. § 14-3110.  At the time of his death, and at all relevant times, Bradley was 31 years old and was a citizen of Arizona residing in Mohave County, Arizona.  The survival causes of action in this lawsuit are based on violations of Bradley's Fourth Amendment rights and Arizona state law.

///

///

4. Plaintiff, Michael Rose, as the personal representative for the estate of Bradley Rose, brings this action pursuant to A.R.S. §§ 12-611–12-613 on behalf of all statutory beneficiaries of the estate of Bradley Rose.

5. The statutory beneficiaries are the surviving parents of Bradley Rose, namely Michael Rose and Julia Rose. Michael, as personal representative, is suing on behalf of himself and Julia for violations of their First and Fourteenth Amendment rights and under Arizona state law. Michael and Julia are, and at all relevant times were, citizens of Arizona residing in Mohave County, Arizona.

6. Defendant, Doug Schuster is, and at all relevant times was, the Sheriff of Mohave County, Arizona. As Sheriff, Schuster was required to keep the peace and make arrests. He was also empowered to appoint deputies to assist in the performance of these duties. Schuster is being sued in his capacity as the employer of Deputies Jose Cardenas, Matthew Farney, Devin Godfrey and Nasia Shrader. Schuster is also being sued in his individual capacity as a supervisory official.

7. Defendants Cardenas, Farney, Godfrey and Shrader, at all relevant times, were employed by Sheriff Schuster as Mohave County Deputy Sheriffs. While engaged in the conduct alleged herein, the deputies were acting under color of state law and within the scope of their employment as Mohave County Deputy Sheriffs. Cardenas, Farney, Godfrey and Shrader are being sued in their individual capacities.

8. Plaintiff is ignorant of the true names and capacities of the Doe defendants, who are therefore sued by such fictitious names. Plaintiff is informed and believes that each fictitiously named defendant is responsible in some manner for the conduct and occurrences alleged herein and the resulting injuries and damages. The reasons that these names are not yet known or the pertinent facts ascertainable are that initial disclosures have not yet been exchanged, and Plaintiff has not yet had an opportunity to engage in other formal discovery. Upon ascertaining the true identifies of the Doe defendants and/or the additional pertinent facts, Plaintiff will amend the operative pleading or seek leave to do so as required by law.

## **PROCEDURAL REQUIREMENTS**

9. On October 8, 2021, and October 12, 2021, Plaintiff's claim was presented to Schuster and Farney in compliance with Arizona's Tort Claims Act. The claim has been deemed denied as a matter of law due to a failure of Defendants to respond.

## **STATEMENT OF FACTS**

10. Bradley had been residing with his girlfriend in Kingman, Arizona, until a few days prior to April 17, 2021.

11. On, or about, April 14, 2021, Bradley decided to move from his girlfriend's residence so that he could get his own apartment. That day, Bradley temporarily moved in with his sister, Ashley, and brother-in-law, Cody, also in Kingman. Ashley and Cody's children, Bradley's nephews, also lived in the home with Ashley and Cody.

12. On April 17, 2021, Ashley and Cody drove to pick up food while Bradley watched his nephews at their residence. Later that evening, Ashley, Cody and Bradley watched a movie while Bradley waited for his father to call him to help move furniture.

13. At approximately 5:00 p.m., Bradley left his sister's home and drove to his parents' nearby residence to help his father. After they were finished, Bradley and his parents ordered pizza.

14. Later that evening, Bradley called his girlfriend to let her know that he was planning to come retrieve the rest of his belongings, some of which he had moved out earlier that week. His girlfriend informed him that would not be a problem.

15. At approximately 8:30 p.m., Bradley left his parents' home and went to his sister's to pick up an empty laundry basket to use to haul his things from his girlfriend's residence. Bradley and his brother-in-law, Cody, agreed to play pool when Bradley returned.

16. At around 9:00 p.m., Bradley left his sister's home and began driving to his girlfriend's residence, about four miles away.

17. During the drive, Bradley suffered a psychotic episode, causing him to lose touch with reality and to drive unpredictably, though not at a high rate of speed.

18. Due to Bradley's unpredictable driving, he was eventually pursued by four Mohave County Deputy Sheriffs, namely Defendants Cardenas, Farney, Godfrey and Shrader. The deputies pursued Bradley in four separate patrol units.

19. In the course of the pursuit, the deputies' sergeant instructed them to disengage because of Bradley's low rate of speed. In response, the deputies slowed their vehicles, fell back, and turned off their sirens and red and blue lights.

20. At no time during the pursuit did the deputies have reason to believe that Bradley was armed. However, at least one of the deputies did suggest over the radio that Bradley may have been suffering from a mental health condition given his unpredictable driving.

21. Bradley's route to his girlfriend's residence on McVicar Avenue was indirect. However, he did arrive at approximately 9:12 p.m., not long after he had departed his sister's home.

22. Bradley pulled his vehicle into the driveway off of McVicar Avenue, turned off the engine and got out of the car. Farney, who was immediately behind Bradley, parked his patrol unit directly behind Bradley's vehicle so as to block it in. As Farney did so, neither his red and blue lights nor his siren was activated.

23. As Bradley exited his vehicle, he turned and faced Farney. Farney noticed that Bradley was staring at him with a glazed-over look in his eyes. Farney could also see that Bradley was unarmed and not attempting to flee the scene.

24. Godfrey and Shrader arrived seconds after Farney, and Cardenas came upon the scene almost immediately after Godfrey and Shrader.

25. Farney was aware that the other three deputies were in the vicinity and available to provide assistance. However, Farney did not confer with the other deputies nor wait for them to confront Bradley. Instead, Farney got out of his vehicle and drew his firearm, which he pointed at Bradley.

26. When Farney exited his patrol unit, he left his body-worn camera in the vehicle, and not on his person in violation of Department policy.

27. Immediately after exiting his vehicle, Farney began closing the distance between himself and Bradley, who continued to appear non-responsive and to stare at Farney with a blank look in his eyes.

28. Farney failed to give Bradley any commands or warnings before unholstering his firearm, approaching Bradley and going hands on with him.

29. Bradley was, and appeared to be, unaware of his surroundings and the circumstances when Farney unholstered his firearm, approached Bradley and went hands on.

30. Farney did not believe that Bradley was armed, nor in fact was he, when Farney unholstered his firearm, approached Bradley and went hands on.

31. Farney was unaware of any criminal history of Bradley prior to April 17, 2021.

32. Farney approached Bradley near Bradley's car while the driver side door was still open. It took Farney approximately 2–3 seconds from the time Farney exited his vehicle to go hands on with Bradley. After another 2–3 seconds, Farney disengaged and put distance between himself and Bradley.

33. After Farney had disengaged, Godfrey and Shrader were present at the scene. Instead of enlisting their assistance or resorting to less lethal force, Farney pointed his firearm at Bradley and shot him four times. Bradley began struggling to breathe and spitting blood from his mouth. He then stumbled a few feet toward his girlfriend's residence before he collapsed, visibly covered in his own blood.

34. From the moment he exited his vehicle, Farney intended to and did employ the use of his firearm. At no time did Farney attempt to tase or use any other less lethal means of force as alternatives to pointing his firearm at and shooting Bradley.

35. Farney failed to communicate with Bradley, failed to give him adequate instructions and failed to give Bradley any warnings including a warning of his intention to use deadly force.

///

36. Farney shot Bradley less than 6-7 seconds after exiting and shutting the door to his patrol unit.

37. Farney retrieved and activated his body-worn camera from his vehicle after the shooting.

38. Deputy Godfrey arrived at the scene immediately after Farney while Farney was hands on with Bradley. Godfrey heard the gunshots and approached Bradley as Bradley was falling to the ground.

39. Godfrey could see that Bradley had been shot, that he was seriously injured, that he was struggling to breathe and that he was physically incapacitated. It was readily apparent at this point that Bradley posed no threat to the safety of others and that he was incapable of actively resisting or evading arrest. Godfrey responded by turning Bradley onto his side so that he could handcuff Bradley's hands behind his back.

40. Deputy Shrader arrived and approached Bradley at about the same time as Godfrey. Shrader pointed her firearm at Bradley while Godfrey applied handcuffs.

41. Seconds later, Deputy Cardenas arrived. With Bradley's hands restrained behind his back, Cardenas used a knife to cut off Bradley's shirt. Bradley's face and body were covered in blood as he struggled to breathe and stay alive.

42. Cardenas, Farney, Godfrey and Shrader were all aware that Bradley had been seriously wounded, that he was incapacitated and that he was fighting for his life. They were also aware that Bradley had been handcuffed. Each officer allowed Bradley to remain handcuffed for nearly 17 of his last minutes alive.

43. Bradley was pronounced dead shortly after 10:00 p.m. that night. The cause of death was multiple gunshot wounds to the chest.

**FIRST CLAIM FOR RELIEF**

**Excessive Force in Violation of the Fourth Amendment to the United States Constitution (Survival Action – 42 U.S.C. § 1983)**

**(By Michael Rose, as personal representative for the estate of Bradley Rose, against Defendants Cardenas, Farney, Godfrey, Shrader, Schuster and Does 1 through 10)**

44. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 43 as though fully set forth herein.

**A.  Defendant Farney for the Use of Excessive Force**

45. Upon exiting his vehicle, Farney unholstered and pointed his firearm at Bradley. Seconds later, he discharged his firearm, shooting Bradley four times. These uses by Farney of his firearm constituted seizures of Bradley's person under the Fourth Amendment.

46. Farney's use of his firearm during the encounter with Bradley was intentional in that Farney intended to unholster and aim it at Bradley. Farney also intended to fire the weapon at Bradley.

47. During the encounter at the McVicar residence, Farney had time to deliberate and determine the amount and type of force to use. He had time to do so while parked and sitting in his vehicle, while approaching Bradley, and after he had disengaged from him after the initial physical contact. However, Farney failed to give commands, failed to give any warnings, failed to attempt a less lethal use of force and failed to utilize the assistance of the three other deputies. Farney was unaware of any criminal history of Bradley. Farney could see that Bradley was unarmed, was unaware of what was happening and was not attempting to flee the scene. Still, Farney made a deliberate choice to get out of his car with his gun drawn and pointed at Bradley. It was less than 6-7 seconds from the time Farney exited his patrol vehicle and shut the door to the time he shot Bradley. Farney's pointing of his firearm at Bradley and his shooting of Bradley were not objectively reasonable uses of force under these circumstances.

48. Bradley had a right under the Fourth Amendment to not be subjected to the use of unreasonable force while he was being detained and arrested. Farney's use of excessive force deprived Bradley of this right, resulting in injuries and damages, including the loss of future earnings, loss of life and loss of enjoyment of life, and pre-death pain and suffering.

*///*

49. Farney's conduct was driven by an evil motive or intent or, alternatively, amounted to a callous or reckless indifference to Bradley's constitutional rights. As a result, an award of punitive damages is proper to punish Farney's wrongful conduct and to deter him and others from engaging in similar conduct in the future.

### B. Defendant Godfrey for the Use of Excessive Force

50. Godfrey's use of handcuffs to restrain Bradley's hands behind his back constituted a seizure of Bradley's person under the Fourth Amendment.

51. Godfrey's use of the handcuffs was intentional in that Godfrey intended to apply them to Bradley.

52. As Godfrey came upon Bradley, he had time to deliberate and determine what, if any, force to use on Bradley. Godfrey could see that Bradley had been shot and was seriously injured. It was apparent to Godfrey that Bradley was incapacitated and needed emergency medical attention. As a result, Godfrey's use of handcuffs for nearly 17 minutes was not objectively reasonable under the circumstances.

53. Bradley had a right under the Fourth Amendment to not be subjected to the use of unreasonable force while he was being detained and arrested. Godfrey's use of excessive force deprived Bradley of this right, resulting in injuries and damages, including the loss of future earnings, loss of life and loss of enjoyment of life, and pre-death pain and suffering.

54. Godfrey's conduct was driven by an evil motive or intent or, alternatively, amounted to a callous or reckless indifference to Bradley's constitutional rights. As a result, an award of punitive damages is proper to punish Godfrey's wrongful conduct and to deter him and others from engaging in similar conduct in the future.

### C. Defendants Cardenas, Farney and Shrader as Integral Participants and for the Failure to Intervene

55. Cardenas, Farney and Shrader were all present at the scene and knew that Bradley had been handcuffed. They were also aware that Bradley had been shot and incapacitated.

Complaint
10

56. All three defendants had a duty and realistic opportunity to intervene so as to prevent and/or terminate the use of handcuffs on Bradley during the nearly 17 minutes that they were applied.

57. Cardenas, Farney and Shrader also participated in a meaningful way in the use of force by Godfrey. Shrader, in particular, provided armed back-up while Godfrey applied his handcuffs.

58. The acts and omissions of Cardenas, Godfrey and Shrader were the cause of injuries and damages, including the loss of future earnings, loss of life and loss of enjoyment of life, and pre-death pain and suffering.

59. Cardenas, Godfrey and Shrader's conduct was driven by an evil motive or intent or, alternatively, amounted to a callous or reckless indifference to Bradley's constitutional rights. As a result, an award of punitive damages is proper to punish Defendants' wrongful conduct and to deter them and others from engaging in similar conduct in the future.

**D.  Supervisory Defendants Schuster and Does 1 through 10**

60. By law, at all relevant times, Sheriff Schuster was required to keep the peace and make arrests in Mohave County. He was also empowered to appoint deputies to assist in the performance of those duties and to provide meaningful training to the deputies. In his position as Sheriff, Schuster had supervisory authority over his subordinates, including Farney. Upon information and belief, certain Doe defendants, at all relevant times, also, or in the alternative, had supervisory authority over Farney.

61. Upon information and belief, the supervisory defendants failed to train Farney in the constitutional limitations on the use of deadly force, including against mentally ill individuals.

62. In failing to train Farney, the supervisory defendants disregarded the known or obvious consequences that this failure would cause the deputies, including Farney, to deprive Bradley of his Fourth Amendment right to be free from the use of unreasonable force.

63. The absence of training in the constitutional limitations on the use of deadly force and the handling of mentally ill individuals actually caused Farney to deprive Bradley of his Fourth Amendment rights.

64. The conduct of the supervisory defendants was so closely related to the deprivation of Bradley's Fourth Amendment rights as to be the moving force that ultimately caused the constitutional violation, resulting in loss of future earnings, loss of life and loss of enjoyment of life, and pre-death pain and suffering.

## SECOND CLAIM FOR RELIEF

**Interference With Parent/Child Relationship in Violation of the First Amendment and of Substantive Due Process Rights Under the Fourteenth Amendment to the United States Constitution (Wrongful Death – 42 U.S.C. § 1983)**

**(By Michael Rose, as personal representative on behalf of himself and Julia Rose, against Defendants Farney, Schuster and Does 1 through 10)**

65. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 64 as though fully set forth herein.

**A. Defendant Farney**

66. When Farney arrived at the scene, he was aware that back-up was close behind. Farney parked at a safe distance from Bradley and did not immediately exit his vehicle. Bradley, who was visibly unarmed, did not attempt to run from the scene or otherwise toward Farney or any other bystander. Further, Farney was able to disengage from Bradley after the initial physical contact, prior to shooting Bradley. As a result, deliberation by Farney was practical prior to the uses of his firearm.

67. Farney's acts and omissions involved the use of excessive force and egregious conduct that caused the untimely and wrongful death of Bradley. In doing so, Farney deprived Michael and Julia Rose of their Fourteenth Amendment substantive due process rights to the companionship and society of their son.

68. Michael and Julia shared distinctively personal aspects of their lives with Bradley. The three of them had a special community of beliefs, experiences and

thoughts. As such, Farney's conduct also violated the First Amendment rights of Julia and Michael to their familial relationship with Bradley.

69. The wrongful acts and omissions of Farney caused damages to Bradley's parents resulting from the loss of the familial relationship with their son.

70. Farney's conduct was driven by an evil motive or intent or, alternatively, amounted to a callous or reckless indifference to the constitutional rights of Bradley and his parents. As a result, an award of punitive damages is proper to punish Farney's wrongful conduct and to deter him and others from engaging in similar conduct in the future.

**B.  Supervisory Defendants Schuster and Does 1 through 10**

71. By law, at all relevant times, Sheriff Schuster was required to keep the peace and make arrests in Mohave County. He was also empowered to appoint deputies to assist in the performance of these duties and to provide meaningful training to the deputies. In his position as Sheriff, Schuster had supervisory authority over his subordinates, including Farney. Upon information and belief, certain Doe defendants, at all relevant times, also, or in the alternative, had supervisory authority over Farney.

72. Upon information and belief, the supervisory defendants failed to train Farney in the constitutional limitations on the use of deadly force, including against mentally ill individuals.

73. In failing to train Farney, the supervisory defendants disregarded the known or obvious consequences that this failure would cause the deputies, including Farney, to deprive Bradley's parents of their First and Fourteenth Amendment rights to the familial relationship with their son.

74. The absence of training on the constitutional limitations on the use of deadly force and the handling of mentally ill individuals actually caused Farney to deprive Bradley's parents of their First and Fourteenth Amendment rights.

///

///

75. The conduct of the supervisory defendants was so closely related to the deprivation of Bradley's parents' First and Fourteenth Amendment rights as to be the moving force that ultimately caused the constitutional violations.

## THIRD CLAIM FOR RELIEF

**Battery (Survival Action – Arizona State Law)**

**(By Michael Rose, as personal representative for the estate of Bradley Rose, against Defendants Farney, Sheriff Schuster and Does 1 through 10)**

76. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 75 as though fully set forth herein.

77. The night of April 17, 2021, at the McVicar residence, Farney intentionally discharged his firearm toward Bradley. When he did so, he intended that the bullets strike Bradley.

78. The discharge by Farney of his firearm caused four bullets to strike Bradley.

79. Farney's misconduct helped produce Bradley's injuries and damages including the loss of Bradley's future earnings. Bradley's injuries and damages, including his untimely death, would not have occurred without Farney's misconduct.

80. Sheriff Schuster is vicariously liable for the acts and omissions of Farney as alleged herein.

## FOURTH CLAIM FOR RELIEF

**Gross Negligence (Survival Action – Arizona State Law)**

**(By Michael Rose, as personal representative for the estate of Bradley Rose, against Defendants Farney, Sheriff Schuster and Does 1 through 10)**

81. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 80 as though fully set forth herein.

82. Farney had a duty to exercise reasonable care in detaining and arresting Bradley.

///

83. Farney breached this duty when he failed to give Bradley any instructions, commands or warnings; failed to wait for, or enlist, the assistance of the other deputies; failed to approach Bradley in a manner reasonable for approaching an emotionally disturbed individual; and failed to use less lethal force.

84. Farney knew or should have known that his actions and inactions created an unreasonable risk of harm to Bradley. Further, that the risk was so great that it was highly probably that harm would result.

85. During the conduct complained of, Farney was acting within the scope of his employment as a Mohave County Deputy Sheriff employed by Sheriff Schuster.

86. The actions and inactions of Farney helped produce Bradley's injuries and damages including the loss of Bradley's future earnings. Bradley's injuries and damages, including his untimely death, would not have occurred without Farney's gross negligence.

87. Sheriff Schuster is vicariously liable for the acts and omissions of Farney as alleged herein.

## FIFTH CLAIM FOR RELIEF

### Negligence (Survival Action – Arizona State Law)

**(By Michael Rose, as personal representative for the estate of Bradley Rose, against Defendants Farney, Sheriff Schuster and Does 1 through 10)**

88. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 87 as though fully set forth herein.

89. Farney had a duty to exercise reasonable care in detaining and arresting Bradley.

90. Farney breached this duty when he failed to give Bradley any instructions or commands; failed to wait for, or enlist, the assistance of the other deputies; failed to approach Bradley in a manner reasonable for approaching an emotionally disturbed individual; and failed to use less lethal force.

///

91. The actions and inactions of Farney helped produce Bradley's injuries and damages including the loss of Bradley's future earnings. Bradley's injuries and damages, including his untimely death, would not have occurred without Farney's negligence.

92. During the conduct complained of, Farney was acting within the scope of his employment as a Mohave County Deputy Sheriff employed by Sheriff Schuster.

93. Sheriff Schuster is vicariously liable for the acts and omissions of Farney as alleged herein.

## SIXTH CLAIM FOR RELIEF

### Wrongful Death – Ariz. Rev. Stat. §§ 12-611–12-613

**(By Michael Rose, as personal representative on behalf of himself and Julia Rose, against Defendants Farney, Sheriff Schuster and Does 1 through 10)**

94. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 93 as though fully set forth herein.

95. Michael and Julia Rose are the surviving parents of Bradley.

96. The death of Bradley was caused by Farney's wrongful acts and omissions, including the aforementioned state law torts and constitutional violations.

97. The wrongful acts and omissions helped produce Bradley's parents' damages, which would not have occurred without Farney's wrongful acts and omissions. Such damages include the loss of Bradley's love, affection, companionship, care, protection and guidance, since Bradley's death and in the future; the lost value of Bradley's services; and Michael and Julia's pain, grief, sorrow, anguish, stress, shock and mental suffering already experienced and reasonably probable to be experienced in the future.

98. Sheriff Schuster is vicariously liable for the acts and omissions of Farney as alleged herein.

99. The misconduct of Farney was driven by an evil motive or intent, or, alternatively, amounted to a callous or reckless indifference to the constitutional rights of Bradley and his parents. As a result, an award of punitive damages is proper to punish

Complaint
16

Farney's wrongful conduct and to deter him and others from engaging in similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. For judgment in favor of Plaintiff and against Defendants;

B. For compensatory damages in an amount according to proof at trial;

C. For punitive damages in an amount sufficient to punish and deter;

D. For pre-judgment interest as allowed by law;

E. For costs and attorney's fees; and

F. For such other relief as the Court deems just and proper.

Dated: ____April 6, 2022___  **PICCUTA LAW GROUP, LLP**

/s/ *C.T. Piccuta*
C. Tony Piccuta
Attorney for Plaintiff, Michael Rose

## JURY TRIAL DEMAND

Plaintiff, pursuant to Fed. R. Civ. P. 38, demands a trial by jury on all issues so triable.

Dated: ____April 6, 2022___  **PICCUTA LAW GROUP, LLP**

/s/ *C.T. Piccuta*
C. Tony Piccuta
Attorney for Plaintiff, Michael Rose