**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Rose, as personal representative for the of estate Bradley Rose and as personal representative on behalf of all statutory beneficiaries of Bradley Rose, deceased,<br><br>Plaintiff,<br><br>v.<br><br>Matthew Farney, et al,<br><br>Defendants. | No. CV-22-08055-PCT-JAT<br><br>**ORDER** |

Pending before the Court is Plaintiff's Motion to Amend/Correct Complaint, (Doc. 54), and Defendant's Motion for Partial Summary Judgment re: Qualified Immunity, (Doc. 57). The Motion to Amend has been fully briefed, (Docs. 60, 63), as has the Motion for Summary Judgment, (Docs. 78, 90). The Court will now rule.

## I.   MOTION TO AMEND COMPLAINT

### a.  Procedural Background

Plaintiff filed a complaint on April 6, 2022, raising a number of federal and state law claims arising out of the deadly shooting of Bradley Rose ("Rose"). (Doc. 1). Plaintiff brought federal law claims under 42 U.S.C. § 1983 for excessive force on the part of the officer who shot Rose and on the part of the officer who handcuffed him. (*Id.* at 9–10). Plaintiff also brought claims against the other officers who were on the scene for being "integral participants" and for failure to intervene. (*Id.* at 10–11). Additionally, Plaintiff brought a claim against Sheriff Schuster for failure to adequately train the deputies

involved. (*Id.* at 11). Plaintiff also brought claims alleging an interference with the parent-child relationship under the First and Fourteenth Amendments against the officer involved in the shooting and the sheriff. (*Id.* at 12–13). Finally, Plaintiff brought a number of additional Arizona state law claims. (*Id.* at 14–16).

The Rule 16 scheduling order set the deadline to file an amended complaint for October 28, 2022.[1] (Doc. 23 at 1). No amended complaint was filed before the deadline. Almost five months after the deadline had passed, Plaintiff filed a "Motion for Leave to File First Amended Complaint and to Amend Scheduling Order to Allow the Same." (Doc. 54). The amended complaint sought to add Mohave County as a defendant and to bring additional federal and state law claims against it and Sheriff Schuster. (*Id.* at 12).

**b. Discussion**

Generally, Rule 15(a) governs a motion to amend pleadings to add claims or parties. But because Plaintiff filed his motion after the scheduling order's deadline for amended pleadings, an additional showing of "good cause" under Rule 16 is required. Fed. R. Civ. P. 16(b)(4); *Johnson v. Mammoth Recreation, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992).[2] With respect to the interplay between Rules 16 and 15(a), a party "must first show good cause" under Rule 16 and then "must demonstrate that amendment was proper under Rule 15." *Id.* at 608; *see also Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 607 (E.D. Cal. 1999); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) ("If [the court] considered only Rule 15(a) without regard to Rule 16(b), [it] would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of

---

[1] Plaintiff asserts that this Court entered a scheduling order on August 5, 2022, setting the deadline for amended complaints for November 11, 2022. This is incorrect. November 11, 2022 was the date set to file an amended answer to the complaint, not an amended complaint.

[2] Despite Plaintiff's assertion that *Johnson* is not applicable to this case, this Court finds that it is directly applicable. Plaintiff contends that the complications involved in adding a new party to a case are not present here because Plaintiff merely seeks to add Mohave County, "whose (sic) is already involved in this action as it is inextricably intertwined with Sheriff Schuster and the defendant deputies." (Doc. 54 at 14). Mohave County is not yet a party in this case, however. And although Sheriff Schuster and his deputies may be employed by the County, that does not mean that no additional burdens will be involved in adding the County as a party to this case. *Johnson* is squarely on point with this case and consequently Plaintiff's motion will be analyzed under it.

the Federal Rules of Civil Procedure.").

Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. *Johnson*, 975 F.2d at 609. In determining a party's diligence, a court may consider:

> (1) that [the movant] was diligent in assisting the Court in creating a workable Rule 16 order; (2) that [the movant's] noncompliance with a Rule 16 deadline occurred or will occur, notwithstanding [the movant's] diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated at the time of the Rule 16 scheduling conference; and (3) that [the movant] was diligent in seeking amendment of the Rule 16 order, once it became apparent that [the movant] could not comply with the order.

*Jackson*, 186 F.R.D. at 608 (citations omitted). Although the court "may modify the pretrial schedule if it cannot reasonably be met despite the diligence of the party seeking the extension," "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Johnson*, 975 F.2d at 609 (internal quotations omitted). In seeking leave to modify the Rule 16 Order to allow amendment, movant has the burden of establishing good cause within the meaning of that Rule. *Morgal v. Maricopa Cnty. Bd. of Sup'rs*, 284 F.R.D. 452, 460 (D. Ariz. 2012).

There is no debate that Plaintiff was diligent in assisting the Court in creating the Rule 16 order. *See Jackson*, 186 F.R.D. at 608. Plaintiff's issues arise at the second step of the inquiry. Plaintiff advances two main reasons for why a post-deadline amendment to the complaint should be allowed. Neither of them meets the good cause standard of Rule 16. The first basis is that new evidence was discovered through depositions that was not available to Plaintiff until after he received transcripts of the depositions. (Doc. 54 at 3–4). Plaintiff asserts that depositions revealed "a serious deficiency and lack of training of deputy sheriffs." (*Id.* at 4). Plaintiff includes sections of the depositions in which the sheriff and other deputies present testimony of an alleged lack of training in the areas of behavioral health crisis response and high-risk stops, among other things. (*See id.* at 7–12). He claims that because he did not have this testimony earlier, he was unable to bring a *Monell* claim against the County and certain state law claims against the sheriff. (*See id.* at 12). Yet this

Court finds that there is no good cause to add the County as a party and to allow Plaintiff to bring in these new claims on this basis. Although the evidence of an alleged lack of training was perhaps made clearer through deposition testimony, Plaintiff had access to detailed training logs that outlined all of the training modules that each of the deputies involved in the encounter went through. (*See* Doc. 60-2 at 6–11). These records were made available to Plaintiff on September 2, 2022, almost two months before the deadline to amend. (*See* Doc. 60 at 3). As in *Johnson* it seems that Plaintiff's attorney here "filed pleadings and conducted discovery but failed to pay attention to the responses [he] ... received." *Johnson*, 975 F.2d at 610. Plaintiff had this information and had the time to amend his complaint before the deadline. No new evidence unavailable to Plaintiff came to light through deposition testimony. Furthermore, this motion to amend was filed on March 24, 2023, a whole month after the last deposition was taken. (*See* Doc. 60 at 4). Thus, even if it could be said that Plaintiff discovered new evidence regarding the deputies' training through the depositions, this month-long delay shows a lack of diligence in making a motion before this Court. Consequently, the good cause standard is not met here.

The second reason given by Plaintiff is that his attorney had so many personal and professional obligations that he was unable to make it through the "voluminous" evidence. (*See* Doc. 63 at 2). Diligence, he argues, should be analyzed based on "the size of an attorney's practice, his case load, his personal family life and a host of other things." (*Id.* at 2–3). Because he is a solo practitioner with a boutique firm, he asserts, he should be given more leeway with deadlines than larger defense firms. (*See id.* at 3). He further states that he has been diligent in litigating this case by engaging in extensive discovery and performing a significant amount of work. (*See id.*). Yet none of this amounts to the showing of good cause necessary under Rule 16. Ultimately what this amounts to is carelessness resulting from an attorney presumably taking on more work than he could responsibly handle. As the Ninth Circuit has stated multiple times, "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *See Johnson*, 975 F.2d at 609. While Counsel for Plaintiff did put in work to litigate this case, the fact that he had

- 4 -

1    other cases pending before other courts and that there were holidays during the months of
2    November and December, (Doc. 63 at 4), do not provide adequate bases for a finding of
3    good cause.

4    **II.    MOTION FOR PARTIAL SUMMARY JUDGMENT**

5         **a.  Factual Background**

6         These facts are presented in a light most favorable to the non-moving party or are
7    undisputed. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

8         After spending the day with his family on April 17, 2021, Bradley Rose left his
9    sister's house at around 9:00 p.m. (*See* Doc. 57 at 2). Later that evening, Officer Godfrey
10   observed Rose as he passed his vehicle in a no passing zone and drove into oncoming
11   traffic. (*See id.*). Officer Godfrey then began to follow Rose. (*See id.*). After Rose
12   committed a number of traffic violations, other deputies in the area began to follow his
13   vehicle. (*See id.*). Officer Godfrey then turned on his lights and siren. (*See id.* at 3). Rose
14   proceeded to run a red light. (*See id.*).

15        Although he stated that he was going to "disengage," after turning off his lights and
16   siren, Officer Godfrey noticed that Rose was still driving erratically. (*See id.*). Rose then
17   pulled over, and Godfrey radioed that he was going to conduct a high-risk stop. (*See id.*).
18   After Officer Godfrey got out of his vehicle and began giving commands to Rose, the other
19   officers joined and parked their vehicles nearby. (*See id.*). Instead of complying with the
20   commands, Rose made a U-turn which led Officer Godfrey to get back in his car to avoid
21   being hit. (*See id.*). As Rose drove between two of the parked patrol vehicles, he struck a
22   third patrol vehicle before driving away. (*See id.*; Doc. 78 at 3). The deputies continued to
23   follow Rose who drove in the wrong lane, almost hitting a tow truck, and onto the shoulder
24   of the road, endangering civilians. (*See* Doc. 57 at 4).

25        Another officer, Cardenas, then turned on his lights to attempt another high-risk
26   stop. (*See id.*). Officer Cardenas exited his vehicle and drew his weapon. (*See id.*). Rose
27   began driving directly at Officer Cardenas, but then swerved to avoid hitting him. (*See id.*).
28   Officer Cardenas radioed that Rose attempted to hit him. (*See id.*).

Eventually, Officer Farney found Rose's car and began to follow it to a residence where Rose stopped his vehicle. (*See id.* at 5). Officer Farney pulled in behind Rose. (*See id.*). Rose got out and stood in the doorjamb of his car. (*See id.* at 6). Rose was described as looking at Officer Farney with a "thousand-yard stare." (*See* Doc. 78 at 4). Rose simply stood by his car and did not attempt to run or assume a fighting stance. (*See id.*). Officer Farney asserts that, at the time, he was concerned that Rose might run inside the house and potentially create a hostage situation. (*See* Doc. 57 at 5). He also could not tell whether Rose had a weapon in his vehicle that he might have reached for. (*See id.*). Officer Farney got out of his vehicle, drew his service weapon, and began to move toward Rose. (*See id.* at 6).

At this moment, Officer Farney testified that he yelled numerous commands at Rose to "get on the ground." (*See id.* at 6). Plaintiff disputes Officer Farney's testimony by arguing that there is no evidence that Farney gave these commands because his body worn camera was in his patrol vehicle, and it did not pick up any audio of him yelling commands. (*See* Doc. 78 at 4). What is uncontested is that Officer Shrader, who arrived shortly after Officer Farney, did give the command to "get down." (*See* Doc. 57 at 6). It is also uncontested that as Officer Farney approached Rose, Rose began to flail his arms at Officer Farney and Rose hit Farney. (*See* Doc. 78 at 5). Officer Farney also testified that at this time Rose attempted to grab his service weapon. (*See* Doc. 57 at 7). Whether Rose grabbed for the gun is disputed by Plaintiff who claims that there is no body worn camera footage showing this. (*See* Doc. 78 at 5). Officer Farney then pulled back and fired at Rose. (*See* Doc. 57 at 7).

Officer Godfrey, who arrived seconds before, saw Rose moving away from Officer Farney after the shots were fired. (*See id.* at 7). Officer Godfrey grabbed Rose by the shoulders. (*See id.*). Rose then fell to the ground. (*See id.*). Officer Godfrey then handcuffed Rose behind his back. (*See id.*). He rolled Rose over and observed a large screwdriver underneath Rose. (*See id.* at 7–8). Officer Godfrey and another officer began performing lifesaving measures on Rose until emergency medical services arrived. (*See id.* at 8). The

handcuffs were not removed until Rose was placed on a stretcher and taken to the hospital. (*See id.*). This occurred seven minutes after Officer Shrader radioed that shots had been fired. (*See id.*).

### b. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A-B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and the elements of the cause of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* A material fact is any factual issue that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat

1    a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment

2    context, the Court construes all disputed facts in the light most favorable to the non-moving

3    party. *Ellison*, 357 F.3d at 1075.

4         At the summary judgment stage, the Court's role is to determine whether there is a

5    genuine issue available for trial. There is no issue for trial unless there is sufficient evidence

6    in favor of the non-moving party for a jury to return a verdict for the non-moving party.

7    *Liberty Lobby, Inc.*, 477 U.S. at 249–50. "If the evidence is merely colorable, or is not

8    significantly probative, summary judgment may be granted." *Id.* (citations omitted).

9         This inquiry changes when the issue of qualified immunity has been raised. While

10   ordinarily a Court would look to whether there are disputed issues of material fact, "when

11   qualified immunity is at stake, a court must first determine whether the law has been clearly

12   established." *Romero v. Kitsap County*, 931 F.2d 624, 628 (9th Cir. 1991). An assessment

13   of whether there are disputed material facts comes in when analyzing whether a reasonable

14   officer could have believed that the conduct at issue was lawful. *See id.*

15        Generally, government officials enjoy qualified immunity from civil damages

16   unless their conduct violates "clearly established statutory or constitutional rights of which

17   a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

18   In deciding if qualified immunity applies, the Court must determine: (1) whether the facts

19   alleged show the defendant's conduct violated a constitutional right; and (2) whether that

20   right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S.

21   223, 230-32, 235-36 (2009) (courts may address either prong first depending on the

22   circumstances in the particular case). Whether a right is clearly established must be

23   determined "in light of the specific context of the case, not as a broad general proposition."

24   *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff has the burden to show that the

25   right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290

26   F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

27   Thus, "the contours of the right must be sufficiently clear that at the time the allegedly

28   unlawful act is [under]taken, a reasonable official would understand that what he is doing

violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (internal quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

The determination of whether a right is clearly established is one for the judge in each specific case to make. *Harlow*, 457 U.S. 800, 818 (1982). In doing this, the Court must consider "only the facts that were knowable to the defendant officers." *White v. Pauly*, 580 U.S. 73, 77 (2017). Thus, it is an inquiry defined by the specific facts and circumstances of the case. While a Plaintiff does not need to find a case that is directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 79 (internal quotations omitted). As the Supreme Court has reiterated, "the clearly established law must be 'particularized' to the facts of the case. *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Plaintiffs should not be able to avoid the effects of qualified immunity simply by pointing to a vague and general right. Otherwise, officers would not be given "fair and clear warning" of the law that governs their specific conduct in the various circumstances they may face. *See id.* at 79–80. Fundamentally, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotations omitted).

The only other circumstance in which qualified immunity does not attach is when a government official's conduct obviously violates clearly established law under general cases such as *Tennessee v. Garner*[3] and *Graham v. Connor*.[4] *See id.* at 80. "Obvious" cases are those that involve "run-of-the-mill" Fourth Amendment violations. *See id.* When a court finds an obvious violation it is saying that "it is almost always wrong for an officer in those circumstances to act as he did." *Sharp v. County of Orange*, 871 F.3d 901, 912 (9th Cir. 2017) (emphasis omitted). But, as the Ninth Circuit has noted, the "obviousness

---

[3] *Tennessee v. Garner*, 471 U.S. 1 (1985).
[4] *Graham v. Connor*, 490 U.S. 386 (1989).

1  principle, an exception to the specific-case requirement, is especially problematic in the

2  Fourth-Amendment context." *Id.* This is so because officers encounter suspects in different

3  and novel circumstances and have to deal with them as those differing circumstances

4  dictate. *See id.* Thus, it is very difficult in the Fourth Amendment context to say that an

5  obvious violation occurred.

6         **c.  Discussion**

7           **i.  Pointing the service weapon**

8       This Court first addresses the contention that because Defendants did not separately

9  address the claim of excessive force stemming from "pointing a loaded firearm at" Rose

10  that it is not before the Court as part of the motion for partial summary judgment. (*See* Doc.

11  78 at 2). Defendants assert that this claim is properly before the Court because the initial

12  complaint never separately pled that pointing the service weapon constituted a Fourth

13  Amendment violation. (*See* Doc. 90 at 13). They argue that the claims stemming from the

14  pointing and the discharge of the service weapon constitute a single allegation of excessive

15  force. (*See id.*). This too is how this Court interprets Plaintiff's complaint. The complaint

16  states, under the first claim for relief, "[u]pon exiting his vehicle, Farney unholstered and

17  pointed his firearm at Bradley. Seconds later, he discharged his firearm, shooting Bradley

18  four times. These uses by Farney of his firearm constituted seizures of Bradley's person

19  under the Fourth Amendment." (Doc. 1 at 9). Despite the use of the language "these

20  uses[,]" this Court reads this as a single allegation relating to a series of events.

21  Consequently, this Court will consider this aspect of the excessive force claim in

22  conjunction with the actual discharge of the service weapon.

23           **ii.  Use of deadly force**

24       Both Plaintiff and Defendants spend a large portion of their arguments discussing

25  whether a constitutional right was violated by Officer Farney. As noted above, in the

26  context of a qualified immunity analysis, a judge need not decide whether a constitutional

27  right exists before determining whether a right is clearly established under precedential

28  caselaw. *See Pearson*, 555 U.S. at 236. Therefore, this Court will first assess whether, at

the time of the Defendants alleged misconduct, there was a clearly established constitutional right. It finds that there was not.

Defendants point to a number of cases that they assert establish that Officer Farney acted reasonably under the circumstances. Specifically, Defendants cite to *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002). That case involved both a car chase, a struggle between a police officer and an offender, and a deadly shooting. In *Billington*, a speeding driver who had swerved into oncoming traffic was being chased by a police officer. *See id.* at 1180. The driver then crashed his car, and the officer drew his service weapon and began walking towards the vehicle. *See id.* The driver, who was intoxicated and initially unresponsive, attempted to start his car and drive away. *See id.* at 1180–81. The driver then proceeded to hit the officer and grabbed him by the throat. *See id.* at 1181. The driver crawled out of his window and began charging at the officer and hitting him. *See id.* A scuffle ensued and the officer shot and killed the driver. *See id.* The Court found that because the driver was locked in hand-to-hand-combat with the officer, the officer did not violate any constitutional rights by shooting him. *See id.* at 1185.

Plaintiff asserts that *Billington* is not on point because in this case Officer Farney was the aggressor. (*See* Doc. 78 at 17). This contrasts with *Billington* where the driver was the aggressor. (*See id.*). Yet the Court does not need to decide whether that case, or any of the other cases cited by Defendants are on point with this case. The burden placed on the Plaintiff is not to show that Defendants cannot point to any controlling case, but that there is precedential caselaw that clearly establishes the right at issue. *See Sorrels*, 290 F.3d at 969. The only case that Plaintiff cites to show that there was a clearly established constitutional right is *Tennessee v. Garner*. The Supreme Court has noted multiple times, that *Garner* lays out "excessive-force principles at only a general level." *White*, 580 U.S. at 79. And, therefore, is not specific enough to serve as a precedential case that clearly establishes a right for purposes of a qualified immunity analysis. As the Supreme Court stated, "we have held that *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'" *Id.* at 80 (citing *Brosseau v. Haugen*, 543 U.S.

194, 199 (2004)). Plaintiff cannot therefore establish that a right was clearly established by simply citing to *Garner*. Yet that is exactly what they did.

Plaintiff argues that he only needs to cite to *Garner* because this is an obvious case. (*See* Doc. 78 at 18). The obvious case principle presents a very high bar, however. Plaintiff argues that Officer Farney was the only person to whom Rose could have posed a threat, that Rose was unarmed and unaware of his surroundings, that Rose only struck him one time, and that Officer Farney was able to back away before firing. Consequently, it would have been obvious to Officer Farney that using deadly force against Rose would be a Fourth Amendment violation. This retelling of the facts involves a good deal of speculation and simplification, however. When assessed in light of all the facts, this encounter does not involve an "run-of-the-mill" Fourth Amendment Violation. *White*, 580 U.S. at 80. This case involved a car chase where Rose broke numerous laws, hit a police vehicle, and endangered the lives of officers and civilians. Furthermore, when Officer Farney finally encountered Rose outside a house, he did not know whether Rose was armed, or whether he would attempt to enter the home and create a hostage situation. Additionally, although there is a dispute as to whether Rose grabbed Officer Farney's service weapon, it is not disputed that Rose hit Officer Farney in the face. These facts do not make for the obvious case. Further, as discussed above, Plaintiff makes no case specific argument that the law was clearly established. Thus, having concluded that this case was not obvious, this Court finds that Officer Farney is entitled to qualified immunity for all of his acts involving pointing and discharging his service weapon.

### iii.  Handcuffing

Plaintiff also argues that caselaw clearly establishes a right to be free from the excessive force involved in the act of handcuffing an unarmed suspect after that suspect has been shot. (*See* Doc. 78 at 20). After distinguishing a number of cases cited by Defendants, Plaintiff cites to two cases to show that this right is clearly established. The first case, *Estate of Srabian ex rel. Srabian v. Cnty. Of Fresno*, involved an armed man who was shot by a police officer responding to a 911 call. *See* No. 1:08-CV-00336, 2012

WL 5932938, *1–*2 (E. D. Cal. Nov. 27, 2012). After the suspect was shot, the officer who shot him, and another officer, applied force to the suspect in order to handcuff him. *See Srabian* at *10. The suspect was then dragged to a patrol car. *See id.* The district court found that the officers were not entitled to qualified immunity for the post-shooting handcuffing. *See id.* at *11. The facts of that case, however, are too dissimilar from the facts involved here for that case to have clearly established a right. First, the officer in *Srabian* saw that the suspect was armed and also that the suspect had dropped the gun after he was shot. *See id.* at *2. Additionally, two officers applied force to Srabian because it was difficult to handcuff him. *See id.* at *10. Finally, the officers dragged the suspect to their patrol car. *See id.* Here, Rose was cuffed after he was shot and the officer immediately began performing lifesaving measures. Furthermore, the judge in *Srabian* found that there was excessive force not because the officers handcuffed the suspect after he was shot, but because of the "combined force by two deputies [used] to handcuff Srabian" after he had been shot. *See id.* at *11. It was the additional force used in the act of handcuffing that was the basis for the excessive force claim. Moreover, even if *Srabian* were directly on point, it still may not have been enough to clearly establish a right because it is an unpublished district court opinion. *See generally Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 7 (2021) (noting that "[e]ven assuming that controlling Circuit precedent clearly establishes law for purposes of § 1983, *LaLonde* did not give fair notice to Rivas-Villegas.").

The second case cited by Plaintiff is *Fisher v. City of Las Cruces*, a case from the Tenth Circuit. This case involved an individual who accidentally shot himself twice. *See Fisher v. City of Las Cruces*, 584 F.3d 888, 892 (10th Cir. 2009). After police officers arrived on the scene, they ordered the individual to lay on his stomach and put his arms over his head. *See id.* He did not comply, so the officers handcuffed him. *See id.* That case is clearly different from this case for a number of reasons. The main reason being that the individual in *Fisher* shot himself. Furthermore, there was not a car chase or any other incidents leading up to the shooting. And in *Fisher*, much as in *Srabian*, the court found excessive force in of the manner in which he was handcuffed, not in the fact that he was

- 13 -

handcuffed. *See id.* at 893 ("As a threshold matter, we agree with the district court that the initial decision to handcuff Fisher was not unreasonable. Rather, the issue here is whether in these circumstances the manner in which the officers handcuffed Fisher, forcibly behind his back while he suffered from gun shot wounds, constituted excessive force."). None of these cases meets the high threshold of the "clearly established" prong of the qualified immunity standard.[5]

### iv.  Integral Participant Theory and Failure to Intervene

Plaintiff's claims that the other deputies on the scene were integral participants or failed to intervene also fail for much the same reasons. Because there was no violation of any clearly established rights stemming out of Officer Farney's pointing his service weapon at Rose or discharging it at him, or out of Officer Godfrey's handcuffing Rose after Rose had been shot, it too is the case that no clearly established rights were violated by any of the other officers on the scene. This applies both to their alleged role as integral participants and for failing to intervene.

### v.  Familial Association Claim

Defendants also challenge Plaintiff's familial association claim under the First and Fourteenth Amendments. They assert that "no similar case put [officer Farney] ... on notice that his conduct violated Plaintiff's familial association rights." (*See* Doc. 57 at 21). Plaintiff counters that *Nicholson v. City of Los Angeles* clearly established the right that was violated. (*See* Doc. 78 at 24). In *Nicholson* a group of four boys were in an alleyway before school, and one was holding a toy gun. *See Nicholson v. City of Los Angeles*, 935 F.3d 685, 689 (9th Cir. 2019). Upon noticing the gun, a police officer jumped out of his car and began running towards the group. *See id.* The officer alleged that he yelled commands at the group, but this fact was disputed, as was whether the officer fired his weapon while running towards them or only after he was a few feet from the group. *See id.* The officer shot and hit one of the boys. *See id.* The court held that the officer's actions

---

[5] Plaintiff also makes passing reference to the fact that this is an obvious constitutional violation. Given the complexity of the factual situation at the time of the handcuffing, this Court finds that this was not an "obvious" Fourth Amendment violation.

violated the plaintiff's Fourteenth Amendment rights. *See id.* at 695. Plaintiff claims that this case "would have put any reasonable officer on notice that Farney's conduct violated the Roses' constitutional rights." (Doc. 78 at 25).

Much like with the other claims, that case is not factually similar enough to this case to have put officer Farney on notice that he was violating a clearly established right. *Nicholson* did not involve a chase or felonious activity as in this case. Furthermore, it was disputed whether commands were given, whereas here it is not disputed that at least one officer gave commands to Rose. Additionally, *Nicholson* involved four friends who did not pose any actual threat to each other or any officers or civilians. Before Officer Farney found Rose outside of the house, Rose had endangered numerous individuals, and officer Farney was unsure whether he was armed or would attempt to enter a house and create a hostage situation. The facts involved in this case are too unique to be covered by the holding in *Nicholson*. Consequently, this Court finds that Officer Farney is entitled to qualified immunity on any familial association claim.

### vi. Supervisory Liability Claim

Finally, Defendants challenge Plaintiff's supervisory liability claim against the sheriff. (*See* Doc. 57 at 22). They assert that "[b]ecause the individual deputies did not violate any of Plaintiff's constitutional rights and are entitled to qualified immunity, Plaintiff's *Monell* and/or supervisory liability claim fails as a matter of law." (*See* Doc. 90 at 20). This Court finds that because there was no violation of any clearly established rights by any of the officers in this case, there was no violation of any clearly established rights by Sheriff Schuster in the training provided to his deputies. Additionally, the burden is on the Plaintiff to show that there was a clearly established right at the time of the incident. *See McKee*, 290 F.3d at 969. Plaintiff pointed to no cases showing that there was a clearly established right.[6] Sheriff Schuster is thus also entitled to qualified immunity on the supervisory liability claim.

---

[6] Despite Defendants claiming that Sheriff Schuster was entitled to qualified immunity, *See* Doc. 57 at 22, Plaintiffs failed to point to any caselaw showing a clearly established right and merely focused on the fact that a constitutional violation had occurred.

### i.  Remaining State Law Claims

Because this Court is granting Defendants' motion for summary judgment on all federal claims, it too will dismiss the remaining state law claims. A district court has the authority to "decline to exercise supplemental jurisdiction over" related state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367. In such circumstances, "the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (internal quotations omitted); *see also Avelar v. Youth And Family Enrichment Servs.*, 364 Fed.Appx. 358, 359 (9th Cir. 2010) ("We have frequently recognized that when federal claims are dismissed before trial, supplemental state claims should ordinarily also be dismissed."). This Court finds that the balance of factors here tips in favor of declining to exercise supplemental jurisdiction over the remaining claims. Thus, all remaining state law claims will be dismissed without prejudice.

///
///
///
///
///
///
///
///
///
///
///
///
///

III.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that Plaintiff's Notice of Motion and Motion for Leave to File First Amended Complaint and to Amend Scheduling Order to Allow the Same, (Doc. 54), is **DENIED.**

**IT IS FURTHER ORDERED** granting Defendants' motion for partial summary judgment, (Doc. 57), as to all federal claims.

**IT IS FURTHER ORDERED** dismissing all remaining state law claims without prejudice because the Court declines to exercise supplemental jurisdiction over those claims.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment, 5 days from the date of this Order, in favor of Defendants on the federal claims only and dismissing without prejudice the state law claims.

Dated this 14th day of September, 2023.

James A. Teilborg
Senior United States District Judge